Filed 11/22/13  Rosa R. v. Superior Court CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| ROSA R.,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>　　　　　Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>　　　　　Real Party in Interest. | F068017<br><br>(Super. Ct. No. 12CEJ300193-1)<br><br>**O P I N I O N** |

**THE COURT\***

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Mary D. Dolas, Commissioner.

Cynthia Von Doren for Petitioner.

No appearance for Respondent.

Kevin Briggs, County Counsel, and William G. Smith, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*　　　Before Levy, Acting P.J., Gomes, J., and Franson, J.

Petitioner, Rosa R. (mother), filed an extraordinary writ petition (Cal. Rules of Court, rule 8.452) regarding her minor child, M.H. (M.). Mother seeks relief from the juvenile court's order issued at the status review hearing setting a Welfare and Institutions Code section 366.26 hearing.[1] Specifically, mother challenges the sufficiency of the evidence supporting the court's findings that the Fresno County Department of Social Services (department) provided adequate reunification services to mother and that mother failed to participate regularly and make substantive progress in a court-ordered treatment plan. We will deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

The "Status Review Report" (SR Report), prepared in June 2013, states the following: On July 27, 2012, M., who was then three months old, "suffer[red] severe physical abuse of bilateral subdural hematomas and bilateral retinal hemorrhages." These injuries were "non-accidental," "life threatening," and "of a nature that would ordinarily not be sustained except as a result of the accelerative/decelerative forces inflicted upon the head." M.'s parents—mother and A.H. (father)—"had no reasonable explanation as to how [M.] sustained the injuries." On July 28, 2012, a section 300 protective hold was placed on M. "due to physical abuse and general neglect through failure to protect by her mother and father."

On August 10, 2012, a section 300 dependency petition was filed in which it was alleged, inter alia, that M. came within the jurisdiction of the juvenile court because she "ha[d] suffered, or there is a substantial risk that [she would] suffer, serious physical harm or illness, [¶] … as a result of the failure or inability of … her parent[s] … to supervise or protect the child adequately." On January 2, 2013, in a combined jurisdiction/disposition proceeding, mother admitted this allegation, and the court ordered

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

that the department provide, and mother and father participate in, the following services: A parenting class, a "14.2.2 and a 14.2.4(a) evaluation," a "domestic violence evaluation and recommended treatment," and a "mental health evaluation and recommended treatment."

In the SR Report and the subsequently prepared August 2013 addendum report, both prepared by social workers Hillary LeRoux and Brenda Thompson, the department reported the following with regard to the services offered to mother and her participation in them.

*Parenting Class*

Mother was scheduled to begin a "Nurturing Parenting Program" on February 13, 2013, but on March 8, 2013, she reported to the department she had been dropped from that class "due to pregnancy and having a doctor's note to justify her leave of absence."[2] On March 13, 2013, she received notice she had been dropped from the class "due to four … no shows." Also on that date, mother reported that she had been diagnosed with Attention Deficit Hyperactivity Disorder and she "would benefit from a class that provides more time to learn." On April 2, 2013, mother started attending a parenting class through Exceptional Parenting Unlimited (EPU) "for individuals with disabilities." On July 26, 2013, an EPU official reported that participants in the class are required to attend 15 of the 18 class sessions, and mother completed the class, attending 16 class sessions and "participat[ing] fully in parenting discussions and activities as well."

*Domestic Violence Services*

On August 28, 2012, mother "attended a [domestic violence inventory] appointment at the Marjaree Mason Center [MMC]…. It was recommended [she] participate in a Child Abuse Batterers Treatment program ["batterers program" or

---

[2]    Mother's second child was born February 23, 2013.

3

"program"]." On both October 12 and October 19, 2012, mother "was a no show" for scheduled sessions of which she was informed several days in advance.

A January 8, 2013, progress report from MMC indicated mother had started the program and completed two sessions, and noted mother "appears to be in the pre-contemplation stage of change as evidenced by her denial to the causes of [M.'s] injuries." In a second progress report, dated February 11, 2013, it was noted mother had attended six sessions, "her lack of maturity appears to be an obstacle for her," and she remained in the "pre-contemplation stage."

On March 11, 2013, the department received a report from mother's batterers program that mother had been dismissed from the program "due to poor attendance." On May 30, 2013, MMC "indicated [mother] did not receive credit for January 15, 2013 due to missed homework." MMC reported mother missed two sessions in February 2013 and was "dropped from the program."

On April 9, 2013, "a re-referral was sent for re-enrollment into [the batterers program] at [mother's] request." During a discussion at a program staffing, mother argued she should not have to pay for the missed classes because "she has a doctor's note for her pregnancy that indicates she could not attend class." However, "[s]ubsequently, [mother] did not provide a doctor's note to the Department." The financial issue was later resolved, and mother re-enrolled in the batterers program on April 23, 2013. In a May 9, 2013, progress report, a program official indicated mother was "engaged in typical defense mechanisms" and displayed "lack of ownership for [M.'s] injuries."

An August 10, 2013, program progress report stated mother had attended 21 sessions and missed two sessions. In multiple progress reports, "it is noted consistently that [mother] is attending and participating in the service as well as that she is verbalizing ownership for failing to protect her child."

4

On August 15, 2013, the program "Facilitator" reported the following: Mother has "verbalized her failure to protect [M.] … but did not provide specifics as to what that is such as [e.g.] running around too much …." Mother has "owned the neglect but still has a ways to go"; she "has not demonstrated change"; she "continues to be immature"; and she "attends regularly but her participation is not adequate in that [the facilitator] has not been able to push her to change." Her "progress is o.k. but not significant."

*Mental Health Services*

On September 19, 2012, mother "participated in a mental health assessment" with therapist Sharon Schafer. Schafer "reported that [mother] has had multiple types of intensive mental health interventions from 1998 to 2010," and opined that "the likelihood for a positive prognosis is minimal and therapy is not recommended." Schafer recommended that mother "participate in a Psychological Evaluation (14.4.2) to determine if additional treatment is likely to benefit her or her parenting," and to "participate in a Psychological Evaluation (14.2.4A) to better determine [mother's] risk with a child."[3]

On February 15, 2013, mother "completed a second mental health assessment" with therapist Christine Lynch, who also recommended a risk assessment "to determine if [mother] can benefit from services and if she poses a risk to her children" and a psychological evaluation. Due to mother's "long mental health history and failure to change over the years," Lynch recommended against therapy. She noted that mother "presents with poor insight and judgment."

Mother "started her Psychological Evaluation" at the California Psychological Institute (CPI) on February 14, 2013, but Dr. Gary Sunday recommended she complete it

_____

[3]     We refer to the 14.4.2 evaluation as the psychological evaluation and the 14.2.4A evaluation as the risk assessment.

5

after she turned 18 on February 28, 2013.  Mother was scheduled to complete the psychological evaluation and risk assessment on March 21, 2013, but Dr. Sunday determined she was reading at only a third grade level and would need 10 hours to complete these assessments.  He scheduled mother to complete them on May 6, 2013.  On that date, however, mother "was a no show."  On May 30, 2013, CPI informed the department that "they are in the process of rescheduling this assessment but that there is a long waiting list and [mother] is at the bottom of that list due to her no show."

On March 29, 2013, mother "reported interest in individual counseling services."  LeRoux explained to her that the department did not recommend counseling and that the court had ordered a psychological evaluation and risk assessment, and "encouraged [mother] to seek counseling through community services."  On May 17, 2013, mother "reported that she is not interested in counseling services."  She "indicated that she does not want to talk about her personal information and thinks therapists ask stupid questions."

On July 15, 2013, mother reported she was going to attend "Voices," an "ongoing support group … for young mothers" offered through EPU.  On August 21, 2013, an EPU official informed the department mother was not attending Voices.

On August 19, 2013, CPI informed the department that mother "continues to be on the wait list" for a psychological evaluation and risk assessment.

LeRoux testified that, as of the date of the September 2013 status review hearing, mother had not participated in the risk assessment, and she (LeRoux) "[did] not have a completed recommendation from mother's mental health assessment."

*Visitation*

Initially, visitation with M. was supervised at the department's Visitation Center (VC), with two visits per week.  In January 2013, both parents started "Therapeutic Supervised Visits" (TSV) with Lauri Anderson, LMFT, with Comprehensive Youth

Services. On March 14, 2013, Anderson "indicated that [mother and father] do not require the level of interventions provided by TSV," and on March 19, 2013, supervised visits at VC were reinstituted. On April 23, 2013, LeRoux "assisted with a transition visit to third-party visitation with Paternal Uncle, [F.H.], as the facilitator." On May 30, 2013, F.H. "reported that visits are going fine and he does not have any concerns at this time."

In June and July 2013, both parents cancelled visitations on multiple occasions, claiming illness. Father told LeRoux that he and mother "were missing the bus on Friday mornings so they could not visit." On August 7, 2013, LeRoux told mother "that so many no shows due to illness only on Fridays was a concern." Mother responded "that she had a doctor's note for all the missed Friday sessions." However, by August 28, 2013, when the addendum report was prepared, mother "ha[d] failed to provide a doctor's note for all her missed Friday sessions."

On August 8, 2013, "the third party supervisor, Ms. Crystal Lopez, reported that visits are going well except for the cancellations on Fridays." Lopez reported "she did not think that [mother] and [father] were ready for unsupervised visits," and that she (Lopez) did not think that [mother and father] take visitation as seriously as they should." Lopez "did not report any concerns with the visits being supervised [by] her."

Throughout June and July 2013, mother and father were scheduled for two one-hour third-party supervised visits per week. On August 8, 2013, LeRoux modified the visitation schedule to eliminate the Friday visits and arranged for one two-hour visit on Mondays.

*Additional Background*

In July 2012, at the time M. sustained her injuries, M. and her parents were living in the home of mother's grandmother (grandmother). The SR Report states that on April 30, 2013, grandmother reported to the department that she "kicked [mother and father] out of her house" because mother "would not take her advice on following up with

7

services to reunify with her children and won't do what she tells her [to] do around the house." On June 3, 2013, mother and father reported they moved back to grandmother's house.

<u>*Juvenile Court's Ruling*</u>

At the status review hearing on September 4, 2013, the court found, inter alia, that the department "has provided and offered reasonable services designed to aid both parents in overcoming the problems which led to the initial and continued removal of [M.]," and "has shown the inaction of the parents creates a substantial likelihood that reunification by the 12 month review hearing, which is less than a month from today, is not likely based on the parents' delay and/or failure to participate regularly and/or make any substantive progress in the court-ordered treatment plan."

The court terminated reunification services to mother and father and set a section 366.26 hearing for December 18, 2013. The filing of the instant writ petition followed.

## DISCUSSION

### Reasonable Reunification Services

Mother contends the juvenile court erred in finding that the department provided reasonable reunification services. Specifically, she argues the department "failed to provide reasonable services" by failing to assist mother in (1) securing housing, (2) securing mental health services, (3) developing a "safety plan," and (4) by failing to "progress mother's visitation." (Unnecessary capitalization omitted.)

<u>*Legal Background*</u>

Section 366.21, subdivision (g)(1)(C) provides that "[t]he court may not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian."

8

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence. [Citation.] '"In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact."' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).) "We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 (*Elijah R.*).)

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.] 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact. [Citations.]' [Citation.]" (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 971.)

"'In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48.) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult….'" (*Alvin R.*, *supra*, 108 Cal.App.4th at pp. 972-973.)

9

"The adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362.) In assessing the reasonableness of reunification services, the juvenile court evaluates not only the agency's efforts to assist the parent in accessing the services, but also the parent's efforts to avail himself or herself of the services. (*Id.* at p. 1365.) "Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220 (*Jonathan R.*).)

*Housing Services*

Mother first argues that the evidence was insufficient to establish the department provided adequate housing services. She asserts the department provided "no direction, help, referral or otherwise that would be of any assistance at all to Mother" in securing housing. In support of this claim, she points to the following testimony of LeRoux at the September 2013 status review hearing: Mother's "housing situation" was "a significant issue from the Department's perspective as to the safety of [M. and her sibling]." To assist mother in "resolving that issue," LeRoux "gave her housing resources." Asked what those resources consisted of, LeRoux responded, "Housing authority, … emergency housing options, maybe going and getting a job through Cal Works, maybe following up and getting a high school diploma so she can search for other types of options. [¶] … [¶] … Given her income and her current situation, she should have qualified for some of those resources."

LeRoux's testimony summarized above apparently refers to her conversation with mother in April 2013 when, according to the SR report, mother "was provided resources for housing options, welfare, and employment." In addition, LeRoux testified that the department asked father to "check in to see if he qualified for housing through being a … former foster child."

The department argues, among other things, that we need not reach the question of whether substantial evidence supports the conclusion reasonable housing services were provided, because such services were neither ordered by the court nor related to the problem—the serious injury suffered by M.—that led to loss of custody. We assume for the sake of argument that under the circumstances of this instant case, housing-related services were among the services the department was required to provide. We conclude that in any event, mother's contention that she was provided inadequate housing-related services is without merit.

The evidence summarized above supports the conclusion that the department provided mother information regarding a variety of options for housing other than the home of mother's grandmother. In addition, the record contains evidence that mother was satisfied with her living situation and did not make efforts to change it. When asked if mother "seem[ed] to understand" when told that her housing situation—living with mother's grandmother—was a "concern" for the department, LeRoux responded: "Like yes and no. What I typically get back is that … [mother] doesn't want to move out, that she wants to be with her siblings and she wants to be with her grandmother and that her grandmother is her support person … and [when mother's grandmother] kicked them out, they went to [father's] mother and … that was their other housing option. And then they moved back with [grandmother]. So they are kind of set in their housing."

It is of course conceivable the department could have provided more services related to housing, although mother does not suggest what those additional services might be. However, as indicated above, the department is required to provide services that are reasonable under the circumstances, not those that might be provided in an ideal world. Moreover, as indicated earlier, we must also consider mother's efforts in availing herself of services. When we apply these principles, we conclude that the juvenile court considering the evidence summarized above and applying the clear and convincing

11

evidence standard could reasonably conclude the department provided mother with adequate housing-related services.

*Mental Health Services*

Mother next argues the department failed to provide reasonable services by failing to assist mother in securing mental health services. In support of this claim, she points to the evidence that after mother failed to appear for her scheduled psychological evaluation and risk assessment on May 6, 2013, she was placed on a waiting list, where she remained as of the time of status review hearing in September 2013, and argues "[i]t [was] not reasonable for the Department to sit on its hands" throughout this period, during which, she asserts, the department "did nothing." Mother's contention on this point too is without merit.

The record shows the following: The department had mother complete two mental health assessments. The two therapists who conducted these assessments opined that therapy would not be helpful, and none was provided, but the department encouraged mother to seek community counseling services. Mother apparently enrolled in the Voices program, but did not attend. The department arranged for mother to undergo a psychological evaluation and risk assessment but neither was completed because mother failed to appear at the time scheduled to complete these services, and the service provider, CPI, placed mother on a waiting list, where she remained through the date of the September 2013 hearing.

Mother faults the department for her failure to complete the psychological evaluation and risk assessment. However, the event that precipitated her being placed on the waiting list, where she remained at the time of the status review hearing, was her "no show," for which, insofar as the record reveals, she has never offered any explanation. There is also no evidence the department had any control over CPI's scheduling policies and practices. Although in an ideal world, a missed appointment would not have the

12

result it had for mother, the record contains substantial evidence that under the circumstances present here, notably mother's unexplained "no show," the department offered mother reasonable mental health services.

*Safety Plan*

Mother argues the department failed to provide reasonable services by failing to assist her with a safety plan. Mother bases this claim on the following testimony of LeRoux: She (LeRoux) never "[had] a staffing where [she] documented a safety plan." LeRoux was asked, "did you ever document that the parents were not communicating or not understanding the safety plan in a signed document that the parents actually had to sign?" She responded, "Unfortunately, we never got to that point." Mother faults the department for "never specifically staff[ing] [the] issue [of safety]" and for failing to attempt "to prepare a safety mapping."

The department argues this contention fails because "lack of a safety plan was not one of the problems that led to the loss of custody" and "assisting the parents enunciate a safety plan was not an element of [mother's] reunification services plan." We assume without deciding that assisting in the development of a safety plan was among the services the department was required to provide. We conclude, as the department also argues, that mother's challenge to the sufficiency of the evidence on this point fails.

Mother's argument ignores pertinent testimony. LeRoux testified to the following: On visitations, "[a]lmost on a monthly basis," she "[sat] down" with both parents "to create a safety plan." She presented to both parents "ideas for safety" and "tried to have them come to an agreement." However, she testified, "we never reached a safety plan" because she "hit a barrier where … either [father] didn't talk … or [mother] just [said] she didn't need any help." LeRoux told mother and father about "strategies to prevent a child from being shaken again," e.g. "walk[ing] away and leav[ing] the minor in the … crib" and having someone else watch the child if she (mother) was "stressed

13

out." Mother responded to such suggestions by saying "she didn't need any help." LeRoux "gave [both parents] examples of what safety looked like. [She would] let them know that [she] need[ed] to come up with a safety plan with them and then it would stop because they would stop the conversation."

Based on the foregoing, the juvenile court reasonably could conclude, applying the clear and convincing evidence standard, that the department attempted to formulate, and get mother to agree to, a plan to keep M. safe from the type of injury she had suffered, which gave rise to the loss of custody, but that mother thwarted these efforts. Thus, substantial evidence supports the conclusion that the department provided reasonable services with regard to assisting mother in developing a safety plan. (See *Jonathan R.*, *supra*, 211 Cal.App.3d at p. 1220 ["Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent"].)

*Visitation*

Mother contends the department failed to provide reasonable services by failing to progress and/or advance her visitation. We disagree.

Mother bases this claim, in part, on the testimony of Jorge Romero, and specifically, as best we can determine, the following: Romero is "an independent private Marriage and Family Therapist," and as of the hearing date, he had conducted approximately eight or nine joint therapy sessions with mother and father. It was his understanding the visitation mother and father are allowed with M. consists of one or two hours per week. In either June or July 2013, he recommended to LeRoux that mother and father be allowed more time because "one or two hours a week is not enough" for a young child.

Mother also relies on the evidence that mother and father progressed beyond therapeutic supervised visits and that the third-party supervised visitation had been going well.

14

Mother does not make clear what she believes the department should have done to "progress" or "advance" mother's visitation. Her reference to Romero's testimony indicates she faults the department for not increasing the number of days and/or hours of visitation. The court, however, was not compelled to conclude, based on Romero's testimony, that the visitation schedule arranged by the department was inadequate. And, assuming for the sake of argument that increased visitation would be beneficial and appropriate, the department's failure to increase visitation beyond present levels establishes, at most, that the current arrangement is not one that would be offered in an ideal world, and does not compel the conclusion that the department failed to provide reasonable reunification services.

In addition, if it is mother's claim that the department provided unreasonable services by not allowing *unsupervised* visitation, her claim also fails. We recognize that at least some of the evidence cited by mother militates in favor of her position. However, as indicated in the previous section, LeRoux testified that in response to her (LeRoux's) efforts to develop a safety plan, mother stated she did not need any help. LeRoux further testified to the following: In her meetings with mother and father, "I don't get any feedback back that they are showing any sort of responsibility [for M.'s injuries]." LeRoux was "essentially … not getting any information from the parents as to what happened [that caused M.'s injuries] or how they would prevent it in the future."

LeRoux's testimony supports the inference that mother could not provide adequate assurance that M. would be safe under an unsupervised visitation arrangement. The evidence cited by mother, at most, creates a conflict with this evidence. And, as indicated above, we resolve such conflicts in favor of the juvenile court's determination. (*Elijah R.*, *supra*, 66 Cal.App.4th at p. 969.) Under the standards of judicial review summarized earlier, the evidence does not compel the conclusion that the department unreasonably failed to "progress" and/or "advance" mother's visitation.

15

***Failure to Participate Regularly, and Make Substantive Progress, in Court-Ordered Services***

As indicated above, the juvenile court did not order the return of M. to her parents' physical custody, and the child was under three years of age at the time of her initial removal from their custody. Under such circumstances, a juvenile court has the discretion to schedule a hearing pursuant to section 366.26 at the status review hearing, if it finds "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e), 3d par.; see *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175-176.) Mother contends the evidence was insufficient to support the conclusion that she failed to regularly participate in court-ordered services and make substantive progress in those services. We disagree.

<u>Standard of Review</u>

As indicated earlier, findings in dependency proceedings are reviewed under the substantial evidence standard discussed above. (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 971.)

<u>Analysis</u>

Mother points to the following factors in support of her claim that she both (1) regularly participated in the programs ordered by the court at the January 2013 disposition and (2) made substantive progress in those programs: She participated in both the court-ordered parenting class—completing the course and attend[ing] 16 weeks without missing a class—and the batterers program—attending 21 classes and missing only two since April 2013; her "delays" in beginning these programs were attributable to her pregnancy and the department's failures; and Romero, the therapist mother had been seeing, testified as to mother's positive attributes as a parent, including her "growth and maturity."

16

These factors, however, to the extent they militate in favor of mother's position, do no more than that. Other evidence supports the opposite conclusion. We address first the no substantive progress finding, for which the record provides ample support. Notwithstanding mother's high level of attendance, the batterers program facilitator indicated the following: Mother "has not demonstrated change," she "continues to be immature," "her participation is not adequate," her "progress" is "not significant," and although she "verbalized her failure to protect [M.]," she displayed little insight into how she might protect her in the future. In a similar vein, LeRoux testified that her efforts to help mother develop a safety plan were thwarted by mother's consistently expressed position that she needed no help in this regard and by her failure to articulate what specific steps she could take to keep M. safe.

The evidence of mother's participation in court-ordered programs presents a closer question because, as indicated earlier, the evidence is undisputed regarding mother's high level of participation in the parenting and domestic violence programs. However, mother was also ordered to complete a psychological evaluation and risk assessment, and she did neither. It is unfortunate that CPI, the entity that was to provide these services, did not reschedule mother, but it is significant that the reason mother was placed on a waiting list, unable to complete the court-ordered assessments, was her unexplained "no show."

We note also that both the risk assessment, which was designed to determine the risk mother posed to M., and the batterers program are of particular importance in the instant case, given that it was the apparent deliberate infliction of serious injury to M. that led to the initiation of dependency proceedings.

When we examine the record here in the light most favorable to the court's ruling and resolve all conflicts in favor of that ruling, we conclude there is substantial evidence such that a reasonable trier of fact could make the finding, under the clear and convincing

17

evidence standard of proof, that mother failed to participate regularly and make substantive progress in her court-ordered treatment plan.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is final forthwith as to this court.